Hear ye, hear ye, hear ye, the United States Court of Appeals for the Fifth Circuit is now open according to law. God save the United States and this honorable court. Thank you and welcome counsel to this proceeding. Just a few reminders. You are not permitted to photograph or video this proceeding as well. Please remember that when you are talking about the record, it is helpful if you give us a record site. We try to memorize the whole record, but sometimes there may be a page or two we don't have. So please do that as well. Please remember that rebuttal is for rebuttal only. And with that, I will call case number 20-40335 Shefeik v. Busby and we will hear from Mr. Gale first. Good morning, your honors. My name is Chris Gale. I have the pleasure of representing Mr. Shefeik in regards to this appeal from a memorandum in order from the district court in regards to an excessive force case. I'd like to start by saying that my client, I represent a man who obviously made some poor decisions in regards to the night in question. And we're not here to seek sort of vindication in regards to his choices, but to see that he's also not punished as a result of them. A lot of the things that transpired in regards to the facts of this case, as I said, were his choices to leave the scene, not stop for the police, things of that nature. And while I believe it's obvious on the video that the officer shot at his vehicle as he was just pulling away from them, that's not the subject of this case. We did not bring suit alleging any kind of excessive force associated with the shooting. Now, maybe that might have been different if he was harmed by it, but he just suffered some property damage as a result. But what we are here for is what transpired after he came into the physical presence of the officers. That's really what we're here for. And the gist, if not the entirety of the appeal in this case, is a concern with the district courts sort of pigeonholing in regards to the events that transpired before the force that we're here for was used. And again, I'm not here to defend the choices that were made. So what is your response to the district court's implication that your complaint set of facts is different from your client's affidavit set of facts? How do you respond to that? Well, obviously, I went back and looked at the complaint. First of all, that's the writing of my office and not necessarily my client. It wasn't under oath. Just so the court is aware, my client's deposition was never taken in regards to the case, hence the reason that the declaration was put together for the purposes of summary judgment. But the court's inclination that it's different, I think at the very best, it probably supplements a lot of facts that are not in the complaint. And quite frankly, the complaint's a little light considering what I normally file in the case, but it doesn't really contradict anything. I don't see anything that's contradictory in regards to the declaration when you compare it to the complaint. When you compare it to the video, there's really very little. I mean, there may be some minor differences in regards to, you know, by feet where somebody, where they initially come up on him. But overall, everything that's in there is, you know, quite frankly, fact issues. So I really, one of the reasons for this appeal is that I didn't see that as being inconsistent in any form or fashion. And even then, as I pointed out in the brief, that inconsistencies are what make cross-examination. They make great fodder for cross-examination, but they shouldn't do anything for the purposes of a summary judgment, except to the extent where it's outright contradicted by video evidence or otherwise, you know, according to Bull or Scott. But that's not the case here. So when he gets to the fence or whatever, he claims that he gets out and puts his hands up. And I mean, I've watched that video. It's quite clear that's not what he did. He got up and ran to the forest, which is what the complaint said he did. So how do you explain that contradiction? You know, memory. I mean, quite frankly, memory in creating the declaration, I, you know, I allowed him to say what he recalled. It is true that he did go to the front of the vehicle. It may have seemed, according to the complaint, that it was immediately in front of the vehicle, but it was in front of the vehicle. You know, all the events did occur right where he said. It was just a sort of maybe an interpretation of exactly where that was. But no, I don't think he ever once said that he just got out of the vehicle and he went to the front of the vehicle, which is what we see on the video as well. I mean, well, I say we see it on the video. The video is hard to see locations and you obviously can't see any of the interaction. I think the importance of the video is almost the audio portion of it more than the video portion. And what he says is, and this is at ROA 182, my truck got stuck. So I got out of the truck and ran around to the front of it. I then put up, put his hands up. I guess he means my hands up and said, you got me. Busby then ran up to me and then he was running towards me. And then, you know, so that sounds like he's still by the truck and we know he's not. We know he's quite a ways away because that's the other half of your argument is you can't really see the actual beating because he's not on the camera. You know, and I wish we did. I wish we had a camera that showed exactly what had transpired for good or bad. I like videos. We don't have that here. What you do hear on it, though, is exactly what he says that you hear him pleading and crying to the officers. You hear the officers and I put in my brief that he said several times that word. It's more than that. I think it was probably at least a dozen times in various fashions and you never see anything on the video, especially afterwards. All they do is query my client about why did you run? They never query about why were you fighting this? Why did you do this? Were you anything of that nature? So, you know, what we hear on there is that my client pleading with the officers and obvious anger because they had to, for lack of a better term, chase him down, you know, and and so that's where we stand. So is it is it fair to say that your issue on appeal, the error that you're highlighting that you think the district judge committed is that he used the video to discount the credibility of your client and from that made a call as to what happened after they left the view of the video. Is that is that a fair characterization of your issue here? I think I think, yes, it's part of it. I mean, I think it's I think there's definitely a concern that the district court in making a determination that there was what they consider errors or differences between the pleadings or the affidavit in the video and using parts of it to discount the entirety of it. And I think that's where the problem lies in part is that the court really made a credibility determination, especially when it made the decision that he was continuing to resist arrest. That statement is wholly unsupported by the video. It's not supported by the audio. It's certainly discounted and not supported by my client whose declaration states the exact opposite, that he had no weapons. He wasn't resisting. And then when we take into account the amount of force that was used on him at that point, I think that's really the problem. The district court did just go into credibility determinations. So are you asking us to vacate the district judge's ruling and send the case back down with instructions that the district judge not rely on the videotape free after the plaintiff tried to run away to make that credibility call? I think that would be a fair question. I don't. I mean, obviously, the district court's order did not address certain issues. And I laid out the ones that we did not address, whether it be hack or the standards. So a lot of those things. But I really think that there are fact issues that preclude the judge's opinion at all. I mean, this may be a case that I try and lose. A jury just might not like Mr. Sheffick, might not like his choices. And at the end of the day, makes a credibility determination that you just can't trust him. But the jury could also say, wouldn't it be a part of the jury verdict form if the case were tried? Qualified immunity, if not granted by the judge early in the case, would be part of the jury's findings as well, correct? According to the Fifth Circuit right now, yes, I would agree with that, that it is included. Now, I'll stand on my soapbox and say that I don't know necessarily that's the way it should be. But but typically in excessive force cases, yes, the jury is going to get a jury instruction for that, don't we? Yeah, there is one. Yes. Yes, Your Honor. And so, you know, and and the jury might come back and find for Mr. Sheffick, but based on credibility determinations by the four against the officers. And so those are the things that I think the district court just kind of usurped. And I think it base value when you first look at the case. I mean, I agree there's some things that should be concerning. And I put in my brief that I would not be concerned in some force used, you know, if they had tackled him and he hit his head on a rock or something of that nature. But that's not the facts here. I mean, I would understand that. But what I don't understand is that the point where as the facts that the district court has to agree are there for the summary judgment record that my client was not resisting at that point and was doing nothing other than standing there with either his hands up or he's on his knees and they're cracking him in the face with a flashlight, breaking his orbital bones, breaking his nose, breaking his teeth. That's excessive in and of itself. And it's more concerning, you know, all the cases, Ramirez, all the ones that have been cited in the briefs dictate the levels of force to meet what you're approaching. And so he's here that when they first pulled him over, they saw that he did have a weapon in the truck. And so for all we knew, no, he had other weapons. I realize you're saying he didn't. I get that. But the question is the sort of objective view of the police officers is that he is probably armed. Does that change the evaluation, if you will, of the excessiveness and at least the qualified immunity to the excessiveness? When you think somebody because, you know, he had a rifle in the truck, you think he might be armed and dangerous while you're sitting there in this forest? You know, I think that's kind of a red herring. You know, I mean, the state of Texas with open carry. I mean, there's not a truck in my neighborhood that doesn't have some sort of rack for guns on it. And so just because he had a weapon wouldn't make that type of force valid. It just wouldn't. And it doesn't. What's your best case for the proposition that this kind of force is not subject to qualified immunity when somebody has fled and is has reasonably believed to have a weapon? What's your best case on that? Well, I think it's asking you're kind of asking for two different cases. But, you know, I think the ones that I put in my brief, I think the Ramirez versus I think it's I should know this. It was my case actually before this, the Fifth Circuit, Ramirez versus Claiborne County, Jim Wells County. It's cited in a recent opinion by the Fifth Circuit. And I wanted to it's the Joseph versus Bartlett case that was issued by a panel by Elrod, Willett and Oldham on November 20th of 2020. It's a really good case in regards to the same types of issues that we have here in addressing a lot of the reasonable standards in regards to the excessive force and the ways in which the officers meet the type of force that they do with what they're combated against. And so in a case in the Ramirez case was obviously a taser case where the gentleman had pulled his arm away from the officer as he was trying to handcuff him. And then he was tased by the officer. This court found that that was excessive force. And I think it is at the moment that whatever has justified some sort of use of force is stopped. Then that's where we judge the excessive force from. And so in this particular case, and I know I'm coming down pretty close, but in this particular case, we've got to assume for the purpose of summary judgment that there was no need for the force. We've got somebody who is stopped. You know, he is not being punished for fleeing. He's not being punished for evading. And at that point, if he is docile, if he has his hands up or is on his knees and is no longer a threat to anyone, hasn't exhibited a weapon whatsoever, hasn't threatened anybody and hadn't assaulted anybody, then to take your flashlight and bash his face in is excessive. If that those facts are true, then summary judgment shouldn't have been granted. It should have gone to a jury to make the credibility determinations that I think that were usurped by the district court. And I think, you know, we'll see what time sells. But but on summary judgment analysis, I do think the court was wrong. And I think it was making some improper credibility determinations. And it was sort of just creating facts that otherwise weren't in the record. So do you think the videotape is helpful at all for this motion? Yeah, I do. I think it's helpful to the plaintiff. I mean, I think it what you hear and I've listened to it countless times. What you hear are one or two officers, you know, depending on which stage you're talking about. But what you hear is anger and emotion, not coming from my client, but coming from the officers. And you hear my client at best. And it is a little garbled with him, but he is not threatening or saying anything to officers. He is pleading for his life and you can hear him crying and pleading. That's all you hear. So I think that for the purposes of summary judgment, I think the video is important. But I think that the court, the district court took the wrong portions of it as being important. You've used your time that you've saved some for rebuttal. And so we will now move to and you need to mute yourself and we will now turn to Mr. McGee. May it please the court. My name is Eric McGee and I represent the appellees in this case, Vernon Busby and Michael Krasinski. At the time of the incident in question, both of these individuals were deputy sheriffs with the Goliad County Sheriff's Office. Vernon Busby and Michael Krasinski respectfully asked the court to affirm the district court's decision, granting their motion for summary judgment based on qualified immunity. First, the court properly granted determined that Busby and Krasinski's actions were necessary for the apprehension and corresponded with the escalating situation that unfolded that night on December 27th, 2016. The appellate cannot overcome Busby and Krasinski's entitlement to qualified immunity as he fails to demonstrate that the use of force was either clearly excessive or clearly unreasonable. So, Mr. McGee, as I understand the allegations here, the officers at the moment of apprehension beat Mr. Shafak in the face with a flashlight. And so my question is, does the video depict that at all so that I could look at the video and say, well, Mr. Shafak says this is what happened, but I looked at the video and I can see clearly that that didn't happen. Can I garner that from the video? You cannot garner a visual, but what you can garner and how the video aids and supporting their entitlement to qualified immunity is the audio. What the video clearly demonstrates, and that's at the record of appeal 157. If you look at timestamp 2643 of the video, it actually shows and contradicts both the original complaint that we filed the summary judgment on and the subsequent declaration. It shows the two officers, Busby and Krasinski run off screen. You can see their flashlight running off the screen to the right at 2643. And that's where the plaintiff, that's where Shafak's case fails, really. It describes an event that didn't really occur on the audio. How does that, how does the, you're saying that the audio, if I listen very carefully to the audio, I'll be able to glean that there was no hitting in the face with the flashlight. Correct. I think what you will hear is the officers, there is no hits or blows on that audio. You hear officers struggling with Shafak to maintain control of his hands. And even after the incident, totally different description than what has occurred in the complaint and in the declaration. So the declaration, I mean, the declaration, do you, do you, you do concede that that's competent summary judgment evidence, right? The declaration. The declaration is summary judgment evidence. However, it contradicts the video itself. I just don't get it. I just don't get it. Where does it contradict? I understand you might argue to a jury that their jury shouldn't find that that happened. And you might be able to draw some inferences from maybe something in the video, maybe from the audio. But the cases I'm familiar with is where a video blatantly contradicts what is in a declaration. And that's, that's, that's our only way that we can just simply disregard otherwise competent summary judgment evidence. Or do you have a case that says otherwise? If you look at the record on appeal 182 and 183, which is the declaration, it says that Mr. He also says. And further, he says, you're going to kill me. He says he provides a different description than what occurs on the video. So, you can see both Busby and Krasinski right beside each other running next to the vehicle and then around the vehicle. And then he describes an entire, it sounds like it's a long period of time. But if you actually go back and listen to the audio at 2643, you hear, you see them run off screen on the camera. Then for multiple seconds, almost a minute later, you hear them running. You hear them breathing and you hear them running through the woods. Then, by the end at 2915, you hear another officer who has arrived and gone out there to the scene say, are y'all all right? In between that less than two minute timeframe, you hear the officer say the same thing repeatedly. Give us your hands and stop resisting over and over again. That audio is different than the description that is given in that declaration. I have listened to that video a thousand times, it seems like, and I have not heard any pleading, begging or crying for his life. I hear a scuffle ensuing clearly on the audio. I hear the officers repeatedly saying, give us your hand and give us a stop resisting arrest. I will admit I did not find it so clear to listen. I will try again, given what you just said. But you've got that really loud horn going on and on. And I could see, I have a naturally loud voice, so probably on any video you would hear me. But I know people with naturally soft voices that if they were talking and you had a big horn going on and on and on, you would not hear them. So I don't know that we can say that we heard everything that happened through this very convoluted audio on this video. We certainly didn't see it, I think is the point that we're making. And so what we did see is pictures of him, bloodied face. So something happened to his face. And your clients have not suggested that he himself with a flashlight. So there is some evidence that someone beat on him. And it doesn't take but two minutes to hurt somebody pretty hard with a flashlight.  And that, Your Honor, is where I think, as Mr. Gale pointed out earlier, I think it's just inconsistent. If you continue through the record, you actually, there is an explanation that's given. He said there's no explanation given as to why anything occurred to Mr. Schiffick. Specifically, if you go to 3458 of the video, the timestamp, Record on Appeal 157, there is a discussion after Busby has searched the vehicle. He has found that there is an empty holster for a handgun. He returns to Mr. Schiffick and he asks where the handgun is. During that discussion, Mr. Schiffick apologizes for the incident at 3447. And then Busby explains to him that when you are encountered with the police, you must give them your hands. And then he says one of his hands was underneath him. And those are all key factors in this case as it goes exactly to the totality of the circumstances and what the officers faced that evening. You can't isolate this to one specific instance without looking at the entire traffic stop and looking at the declaration and his complaint. So I agree that the officers being concerned about the fact that he might have a weapon, that he was running away. All of that would give them the right to give him some force. But let's imagine I'm not saying this happened, but let's imagine the video showed he was completely handcuffed and even his feet were cuffed. And then they just started hitting him with the flashlight. No one would say that wasn't excessive force because by then he was cubby. So the problem is that you've got a time period, you've got kind of a road here. And at every point, it does matter. Once they have him subdued and under control, they can't keep beating on it. To get him subdued and under control, they may can't. So that's to me, the hard part here is where is the evidence that 100 percent shows that he was continuing to resist throughout the entirety of the beating? That's contained on the audio, and I think this is very similar to the Escobar versus Monty case from the Fifth Circuit. 859 F at 387 at 2018, although that's a dog bite case. It was a pursuit of someone at the time at night who had had a knife and had run from the police officers. And at that time, the court in Escobar says that they gave all the favor to the plaintiff, assuming he had dropped his knife. He laid flat on the ground and like a parachute man just before being bitten by the police dog. He did not struggle. He begged for the dog to be removed, and he claimed that the bite lasted for over one minute. In that case, the officers got qualified immunity. And what the court what the Fifth Circuit specifically said is that the plaintiff wanted to limit. The view of all the circumstances that occurred that night into a very detailed thing, what they left out were several key facts that the chase was at night. That Escobar hid from the police that they thought that he was dangerous and that they didn't know whether this was some sort of ploy and that he was ready to snatch and run again. That's the exact same situation we faced that night. We have two officers who knew very key facts of that evening, which are different than what stated in the declaration and in the complaint that we filed the motion for summary judgment on. I guess the difference that I hear in that case is that we know the kind of force that was employed. It was a dog bite that that might have lasted up to a minute here. I don't I don't think we have an agreement as to the nature of the force that was applied. Do we. There was an altercation that ensued that required them to gain control of his handcuffs. That's that's very lawyerly language and altercation ensued that required them to. We don't know whether they bashed him in the face with a flashlight, do we. We're not agreeing on that, are we. There is no evidence on that. There's not even anything. Your Honor. His statement, isn't that evidence. Except that it doesn't match up with the audio from the actual altercation. But it does match up with his face because generally punching doesn't lead to this kind of streams and streams of blood and scars or scars on their way. So I you know, a punch is different than a boom with a flashlight that can kind of scratch your head like that. So, I mean, he says he was pounded by a flashlight. They said they use the soft and then the hard of their hands. And that's exactly what fact issues are where people disagree. And I agree that he's not very credible in the rest of what he says leading up to that because most of that's contradicted by the video. But that core piece, the part in the forest. I wish we had a body cam because then we'd know, but we don't. Or it was so dark. You probably we still may not have a clear visual of that as the scuffle ensued. What I think we absolutely know from it, though, and I guess I look at it differently because he can be seen when he is escorted back to the scene. And there is a stream of blood, a single stream of blood. I don't I don't. I can't, I can't really show this, but I'm. Yeah, too bad. I won't show up on the video, but I'm looking at, I think it's page 180 okay 184 and 185. Yes, those were the photos taken. The side of his head where you've got. I wish I could show it to you all, but it where you just got blood everywhere. And it's not just the bleeding, but you can see that there are. It's almost like scissors in his head. So, I mean, that's seems more consistent with the flashlight than a punch. Well, regardless of that, your honor, even if you gave that credibility argument to the plaintiff there. I, Mr. I still think that you're not looking at the totality of the circumstances that were involved the split second decisions that are required at that particular moment facing those officers and no one would even consider those to be unreasonable. That split second decision was that he had a weapon as far as they knew. The issue isn't really about did they need to use force? It's about what force did they use and when and how much was needed because they are denying the flashlight. So, this isn't where they're saying, yeah, we have to use the flashlight because he was pulling a gun on us or something like that. They are not agreeing with him on the facts and then debating how the law applies to that. They're disagreeing on the facts. And so, unless the facts are irrelevant, we have a problem. So, can you tell me why it's irrelevant whether they hit him with a flashlight or not? For the reason, the same reason in Escobar that the dog continued to bite him. There are facts in this case of where you have to look at the totality of the circumstances that they faced that evening to determine is it unreasonable that when apprehending a suspect that has attempted to flee twice, not just once. He's attempted two different flights to escape from the police officers. He's knowingly given a false name and he had a weapon in his vehicle at the time. And so, I think the officers' security and safety at that point, not only in apprehending him, but making sure that he is handcuffed is different than the necessity of the force used. Because, I mean, this could have been a very different circumstance and there's a string of case law out there during pursuit chases where deadly force is used and officers are entitled to qualified immunity under deadly force cases. This is not the circumstance, even if you arguably assume that the plaintiff says that a flashlight was used. This is not a deadly force case. And those were a lot of the cases that were cited by the plaintiff in his brief with some deadly force cases here. That's not the case of what we have here. These officers did not escalate the necessity for force to any level of deadly force. They used measured judgment and attempted to have a tempered response throughout the entire process of this altercation. And that's where the pool case comes back into question is what does the audio and the video actually show in this case? I was on the pool case and I remember that video. And it was a video of what actually happened. So that kind of helped. And it was a different type situation on the pool case than an escape where someone was attempting to run from the officers at two different steps here. Here we have very specific facts of why Busby and Krasinski led Chase into the woods. And that audio, although it isn't a body camera, I understand that. And it doesn't show a clear video. That audio just disputes and contradicts even what is contained in his declaration. I wanted to talk about a couple of the other things that are in the declaration that he says. He gives an example of a portion of this happening before Krasinski even arrived. Well, that's not even depicted on the video. Busby and Krasinski both were leading Chase at the same time. There is no audio anywhere on there that the other officers showed up and yelled for Busby and Krasinski that that's enough. The other officer can be heard. He says, are y'all all right? It's momentarily after they finally catch up with him. And then he also presents an entire different situation of where these officers then, I mean, Mr. Gale actually said he hears anger and hears something different in these officers voice just because they had to chase them in the woods. That's not the allegation. That's not even what occurred in this case. He says, Mr. Sheffick says that he was drug out of the woods because he was stumbling and have so many problems walking. That's not shown on the video at all. Actually, it shows that he's escorted out. He's walking perfectly fine at 30, 50 of the video. And then just right after that, I think where the circumstances really show in this case is how dark it is at night, how thick the brush is, that there is a fence down. Officer Busby immediately falls face first after he's walking back to the video at 30 to 15 at the timestamp just to go look for the rifle and any other potential weapons at that point. And like I said earlier, I think the video is very, the audio is very clear that the plaintiff then apologizes for what happened. And Busby explains that you have to give your hands up. These are not officers that are angry. These are officers that are very professional. They're giving full explanations. And one of the explanations is when you have one hand underneath you, you have to give that up. And that's where Busby and Krasinski asked this court to affirm the district court's decision and not take an approach of trying to piecemeal and freeze frame everything under that Graham prohibited statement of 2020 hindsight, where we actually look at the totality of the circumstances and how each one of these unfold, how rapidly these unfolded and how these split-second decisions required the officers to give up their hands. To make the judgment that they made, to apprehend him and use force against him. Thank you for your time. Okay, thank you. We have your argument. Mr. Gail, you reserved some time for rebuttal. Just a couple of things. The first thing that comes to mind is in listening to the video is the thing that the defendants seem to completely ignore. It's the use of the up term. And I know that that's something that comes about in normal day life now, more so than has in relevant history. But, you know, what we hear in there is them calling my client because he was he fled from them, a stupid MF-er. They tell him numerous times to shut the F up. I mean, obviously, he is trying to. You didn't sue him for using strong language, though, did you? I did not. I did not. But, you know, but I think the video. Flashlight, right? Yeah. I mean, but I think the circumstances in which it's being used and the manner in which they're speaking to him. I mean, it's obvious on the thing that he is saying something to them and they just don't care and that they're using a flashlight. I think for the defendants, the biggest concern is, is that this court and the underlying district court hear nothing from the defendants as far as how the injuries occurred. Not a peep. They don't say it wasn't a flashlight. They don't dispute that a flashlight was used. They just dance around the facts and say that they used the force that was necessary under the circumstances. And they never once give any instruction or any kind of evidence as far as how these injuries occur. They don't say that he accidentally hit a tree root or a fence post or anything else of that nature. They say nothing. So the only evidence that the district court and or this court have is the declaration of my client and the obvious injuries that resulted in him having a metal plate put in his face. You know, those alone create a fact issue on which summary judgment should not be granted. 156 is Krasinski's use of force summary. And it said it says that thing about the empty hands, the soft hands, the soft hands didn't work. So we used hard hands with fist strikes to Sheffick's head, which seems to. I mean, it doesn't directly say I didn't use a flashlight, but that seems inconsistent with a flashlight. A fist and a flashlight are obviously two different things. And then said hard hands were effective and were finally able to get him restrained. And I agree. In the record, there is some there is some admission that they did use some force on him. That's might be. Irrelevant, but we're not really. I mean, obviously, we dispute the fact that it was just this. I mean, our allegations are that they immediately went to the use of a flashlight to break my client's orbital bones, his nose, his cheek and his teeth. You know, but there is some evidence in there because I think they have to admit that there was some fisticuffs used. But they don't really describe to what parts of the body or anything else. And the evidence seems inconsistent with his head. It does say his head. But I guess to me, the cuts kind of seem more consistent with the flashlight than with a fist. But again, I mean, my my assumptions are not the question here. And the defendants may very well convince a jury that these were just simple fisticuffs that were necessary and just happened to inflict this type of injury on him. But at the same time, the evidence really doesn't seem to support that. But again, that's that's fodder for argument of counsel at time of trial and the credibility determinations that we made by jury in regards to what was necessary and what was reasonable to the circumstances. And what's your best response to Mr. McGee's argument? Look, you can't parse every last second because that's not how qualified immunity works. It's totality. It's this and that. How do you respond to that sort of last couple of minutes of his argument? You know, I mean, I guess it kind of depends on the particulars of a case. I mean, we can come up with many different kinds of scenarios where there is no lapse between each, let's say, level of force that's used and or the interaction between the officers. But in a case in which it's alleged that regardless of whatever the chase was or how long it was or anything of that nature or allegations regarding, you know, I mean, let's step back for a second. The only person that actually had a weapon that was firing at anybody was the officers. And they actually try to use their own firing of a weapon to justify their use of force in regards to my client. In their arguments, they heard shots fired. They're the ones that have made the shots. You know, so you can't you can't shoot at my client and use that as a justification. But I think in all the cases, what you have here at the end of the day is allegations that he was not harmed anybody at that point. He was still he was there and there was no reason for the bashing with the flashlight. And that's what you have. And that's the that's for jury to make a determination if that's true or not. I appreciate your time is expired. And unless my colleagues have any further questions, we have to let you all go. So thank you. The case is under submission. All right. Thank you.